2012 Ark. 201

**Broderick Lloyd LASWELL, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CR 11–940.**

Supreme Court of Arkansas.

May 10, 2012.

820

Tim Buckley, Kent McLemore, John G. Hall, Buckley, McLemore & Hudson, Fayetteville, for appellant.

Dustin McDaniel, Atty. Gen. and Laura Shue, Asst. Atty. Gen. for appellee.

PAUL E. DANIELSON, Justice.

Appellant Broderick Lloyd Laswell appeals the judgment and commitment order of the Benton County Circuit Court finding him guilty of capital murder and aggravated robbery and sentencing him as a habitual offender to life imprisonment without parole plus 720 months' imprison-

ment, respectively. On appeal Laswell argues that the circuit court erred by: (1) denying his motions for directed verdict; (2) failing to exclude certain character evidence; (3) admitting certain crime-scene evidence; and (4) excluding the expert testimony of Dr. Cunningham during the guilt phase of trial. We find no error and affirm.

On August 30, 2007, David Weaver and Melissa Lacy went to visit Randy Walker at his home on Beaver Hollow Road in Garfield, Arkansas, and discovered that there had been a house fire. They entered Walker's residence and found Walker's burned body in the back bedroom. They then called 911 and first responders were on the scene within minutes.

The Northeast Benton County Fire Department and the Benton County Sheriff's Department, including Investigator Greg Hines, Investigator Richard Feast, and Fire Marshall William Hanna, arrived at Walker's residence to investigate. Investigator Hines interviewed David Weaver and Melissa Lacy and then conducted a tour of the scene.

Investigator Feast and Fire Marshall Hanna also investigated. Fire Marshall Hanna concluded that the fire had been intentionally set and had originated in the bedroom. Hanna had noticed a red blob in the bedroom and suspected it was a fuel can. When he inspected the detached garage, he saw a row of gas cans and one appeared to be missing. The crime lab later confirmed that ignitable liquids had been poured in the bedroom and on Walker's clothing. Hanna also viewed Walker's body and noticed damage to his neck. It was unclear to him how the damage had occurred as he had never seen an evulsion on the neck. Hanna testified that one of the primary reasons for arson is to destroy evidence to conceal a crime.

Walker's son, Randall Lee Walker, II, was notified of Walker's death on August 30, 2007, by Melissa Lacy's sister, Megan Wright. Randall, his girlfriend, his grandmother, and his brother drove to Arkansas on Friday, August 31, 2007. Randall spoke with Investigator Feast of the Benton County Sheriff's Department and believed the family had permission to try to salvage what was left of his father's property. Randall and the others returned to Walker's residence on Saturday, September 1, 2007, with a U-Haul trailer and began removing some items from the residence. They moved several items that did not fit in the trailer into the garage. When Randall returned to his father's residence a few days later, there were detectives inside Walker's home, and Randall was not permitted to remove additional items.

On September 2, 2007, Brandon Lacy called the Rogers Police Department from the Hi-D-Ho Restaurant in Rogers, Arkansas, and told police officers that he had committed a murder in Benton County. When the police arrived, they discovered that Lacy was intoxicated and arrested him for public intoxication. Lacy was transported to the Benton County jail, but Investigator Hines decided to wait to question him until the next morning, to allow Lacy to become sober.

The next morning, September 3, 2007, Investigator Hines interviewed Lacy. During the interview, Lacy admitted that he had participated in the murder of Randy Walker. While Lacy was reluctant to tell the police who had participated in the homicide with him, it was discovered that it was Laswell.

Laswell was arrested and admitted to being involved in Walker's murder. Laswell admitted that he hit Walker with a weight bar, but claimed that it was only after Walker showed a gun. Laswell

claimed that a struggle ensued. Laswell went with the investigators to the location where he and Lacy had disposed of the evidence from the night of the murder.

Lacy admitted in later interviews to stabbing Walker in the chest with a fire place poker and slitting his throat with a knife. He said that he thought Walker was "pretty much gone" after Laswell hit him over the head with the weight bar, but he stabbed him and slit his throat to make sure. Lacy admitted that he took a .22–caliber gun from Walker's residence and hid it at his cousin's house.

Laswell was charged as a habitual offender with capital murder and aggravated robbery. After a jury trial, he was convicted of both and sentenced to life imprisonment without parole plus 720 months' imprisonment. It is from these convictions and sentence that he brings the instant appeal.

For his first point on appeal, Laswell argues that the circuit court erred in denying his motions for directed verdict because the evidence was not sufficient for the jury to find him guilty of capital murder, aggravated robbery, or the lesser-included charges of first-degree and second-degree murder. The State avers that the evidence was sufficient to support Laswell's convictions and that this court need not address the argument as to the lesser-included charges because Laswell was not convicted of those.

On appeal, we treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *See Smoak v. State,* 2011 Ark. 529, 385 S.W.3d 257. In reviewing a challenge to the sufficiency of the evidence, this court determines whether the verdict is supported by substantial evidence, direct or circumstantial. *See id.* Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *See id.* When a defendant challenges the sufficiency of the evidence that led to a conviction, the evidence is viewed in the light most favorable to the State. *See Sullivan v. State,* 2012 Ark. 74, 386 S.W.3d 507. This court does not weigh the evidence presented at trial, as that is a matter for the fact-finder; nor do we assess the credibility of the witnesses. *See id.*

The credibility of witnesses is an issue for the jury, and we will disturb the jury's determination only if the evidence did not meet the required standards, thereby leaving the jury to speculation and conjecture in reaching its verdict. *See Ellis v. State,* 2012 Ark. 65, 386 S.W.3d 485. In assessing the weight of the evidence, a jury may consider and give weight to any false and improbable statements made by an accused in explaining suspicious circumstances. *See Sullivan, supra.*

As previously noted, Laswell was charged with capital murder and aggravated robbery. "A person commits robbery if, with the purpose of committing a felony or misdemeanor theft ... the person employs or threatens to immediately employ physical force upon another person." Ark. Code Ann. § 5–12–102(a) (Repl.2006). A person commits aggravated robbery if he commits robbery as defined above and inflicts or attempts to inflict death or serious physical injury upon another person. Ark. Code Ann. § 5–12–103(a)(3) (Repl.2006). A person commits capital murder if, acting alone or with one or more other persons, the person commits aggravated robbery and in the course of or in furtherance of the aggravated robbery, the person or his accomplice causes the death of a person under circumstances manifesting extreme indifference to the value of human life. Ark.Code Ann. § 5–10–101(a)(1) (Repl. 2006) & (Supp.2007). Additionally, a per-

son commits capital murder if, "[w]ith premeditated and deliberated purpose of causing the death of another person, the person causes the death of any person." Ark.Code Ann. § 5–10–101(a)(4) (Supp. 2007).

Laswell contends that the circuit court erred in denying his motions for directed verdict because the State failed to prove (1) that the "in course and furtherance of" element was met; (2) that Laswell had the intent to rob; (3) that a robbery occurred; or (4) that Laswell had the premeditated, deliberate purpose to kill.

At trial, the State presented several witnesses and several exhibits, including two interviews of Laswell himself conducted by Investigator Hines. First, Sergeant Thomas See of the Benton County Sheriff's Department testified that on August 30, 2007, he responded to a call about a fire at Randy Walker's home. Inside the home, there was a strong odor of smoke, soot on the walls, and a pungent odor of burning flesh. Walker's body was found on the floor in a back bedroom. Sergeant See observed a weight bench in the bedroom and an open gun safe in the closet of that bedroom. A recliner that was in the living room had to be moved in order to remove Walker's body from the home.

Fire Marshall Will Hanna then testified as to his observations and conclusions from the scene at Walker's home that night. Hanna testified that the fire, which started under the bed in the bedroom where Walker's body was found, was confined to the interior and self-extinguished, with no external damage to the home. He found a burned red blob in the room and suspected it was a fuel can. Hanna ruled out any accidental causes of the fire. The crime lab confirmed this for him as ignitable liquids had been poured in the area of the bedroom and on Walker's clothing, and the red blob was, indeed, a gas can. Hanna

also observed the safe in the closet, which he concluded had been opened before the fire because of the soot inside. Additionally, Hanna stated that a primary reason for arson is to destroy evidence to conceal a crime.

Mark Queen, a witness who had met both Laswell and Lacy at inpatient alcohol treatment, testified that Laswell and Lacy were friends. Queen testified that Laswell and Lacy both seemed to need money and that he had loaned money to Laswell for drug-court fees. Transcripts from drug-court proceedings were also entered into evidence in which Laswell discussed financial constraints. Queen stated that Laswell was often outspoken in drug court and talked back to the judge. Queen further testified that he had once overheard Laswell and Lacy talking about money and heard the word "rob." Queen believed that Laswell was impressed with Queen's past life as a drug dealer and testified that Laswell mentioned he wanted to live a "thug life" and once asked if Queen could get him a gun. While Queen testified that Lacy was older than Laswell and seemed more street-wise, he did not believe Laswell was intimidated by or fearful of Lacy. Queen had once told Laswell to stop hanging out with Lacy, but Laswell told Queen he could handle himself.

Investigator Hines, who had been the lead investigator, also took the stand during trial. Hines testified that he interviewed Lacy after Lacy had called the police and admitted his involvement in a murder in Benton County. The investigation led to the discovery of Laswell's involvement. Laswell was brought in and was read his *Miranda* rights on September 3, 2007. Laswell told Hines about his involvement on the night of the murder and using a weight bar as a weapon against Walker. That interview was played for the jury. Hines also inter-

viewed Laswell on September 4, 2007, after again advising him of his *Miranda* rights. That interview was also played for the jury.

Laswell stated that he and Lacy went to Walker's home around 11:00 at night and awakened Walker. While in Walker's living room, after Lacy asked Walker about his old gun, Walker pulled out a revolver from between the couch cushions and showed it to them. Then, for no apparent reason to Laswell, Lacy got up and began to hit Walker over the head with a fireplace poker. Laswell told Hines that Walker kept asking "why?" Lacy demanded Walker give him the keys to his safe. At this point, Laswell told Hines that he went outside to his car, took off his shirt, and smoked part of a cigarette. Laswell claimed that when he came back inside, Lacy was telling Walker that he wanted to know where more guns were because they were not in the safe. Laswell further claimed that Walker went back to the bedroom with he and Lacy and a struggle then ensued between Lacy and Walker for the gun.

Laswell admitted to unscrewing two caps and taking two weights off of each end of a weight bar in the bedroom and swinging the bar overhead using both hands to hit Walker on the head. Laswell told Hines that Walker "didn't do anything" after being hit the first time and that it "didn't even faze him," so Laswell "hit him again." Although Laswell claimed that this occurred during the struggle and that Walker was in a sitting position at the time, Lacy had told Hines that Walker was flat on his back, looking up at them. Hines opined, because of the bedroom's low ceiling and Laswell's height, Laswell would had to have been bent over and Walker would had to have been flat on the floor for the way Laswell demonstrated himself swinging the weight bar. Las-

well said that he then walked over to the safe and looked in "to see if there was anything else in there." Laswell stated that Walker was still alive, trying to breathe, and making gurgling sounds when Lacy stabbed Walker with the poker and cut his neck with a knife from the kitchen. Laswell wiped down the weight bar before they left that night. Laswell said that Lacy told him to go to his car with a green bag that Lacy handed to him. When Lacy came out of Walker's house and they left, Lacy told him that he had set the house on fire.

Laswell stated that from the house, they took the fireplace tools, the kitchen knife, the gun, a green army bag, Walker's wallet, and some towels. Laswell was able to tell Hines that the wallet contained $20, a Social Security card, a driver's license, and a credit or debit card. After leaving the scene, Laswell and Lacy stopped to purchase some Red Bull beverages and went to a boat ramp. Laswell showed officers where the fireplace tools had been discarded and a dive team later found them in the lake. Laswell also showed officers where he and Lacy burned their clothing and a knife. Hines located Laswell's shoes in his garage. Laswell saw Lacy with the gun the day after the murder.

Walker's son, Randall Walker, II, testified that he and his father knew Brandon Lacy. He further testified that Walker possessed multiple guns in a locked gun safe in his bedroom at the time of his murder and that he kept weights in his bedroom due to his multiple sclerosis. He testified that the weights included a bench press, curl bar, and dumbbells with individually stacked weights that had to be unscrewed to remove them. After he was notified about his father's death, he and some other family members went to the

house. During the time spent there, he saw the detectives carry out a weight bar.

Investigators Richard Charrell Ivy, Geovani Serrano, and Dennis Schumacher testified about the evidence collected, including blood spots, an empty weight bar, and a Heritage .22–caliber revolver and ammunition that was recovered from the home of Lacy's cousin. Chantelle Taylor, an Arkansas State Crime Laboratory criminalist, testified that gasoline residue was in the debris found by the bed and on Walker's clothing, and that the melted red container was a fuel can. Krista Buck, a forensic serologist, testified that after testing samples, she found blood from the inside of the front door, the kitchen floor, the recliner, Lacy's shoes, Laswell's right shoe, on the middle of the weight bar, four spots on a rag, and Walker's shoe. Mary Simonson, a forensic DNA examiner, found Walker's DNA in the blood on the door, the kitchen floor, the recliner, Lacy's shoes, Laswell's right shoe, the weight bar, and in the blood spots and in skin cells on the rag.

Dr. Frank Peretti, the medical examiner and forensic pathologist, testified that he examined Walker's body on September 4, 2007. Peretti stated that the body had three distinct sets of injuries: blunt force, stab, and cutting wounds. There were six blunt-force impact sites to the front of the head, but no impact injuries inflicted to the back of the head. The facial skeleton, the top of the head, and the base of the skull were shattered. Peretti testified that Walker was alive when the blunt-force head injuries—the shattered face, top of the head, and back of the skull—were inflicted. Walker was struck on both the right and left sides of the forehead while his head was, in Peretti's opinion, probably on the ground or against a firm object, resulting in eggshell fracturing and pieces of bone going into the brain. Peretti testified that a person had not yet suffered a fractured skull and facial structure if he could walk from room to room. Peretti further testified that each of the wound-sets separately—the skull fractures, the throat cutting, or the stab wounds—was a cause of death.

■ After reviewing the record, based on the testimony and evidence offered at trial, we hold that there was substantial evidence to support the jury's verdict that Laswell committed aggravated robbery and capital murder.[1] The State offered proof that Laswell drove Lacy to Walker's house late in the evening. Laswell admitted they awakened Walker. Laswell knew Lacy was hitting Walker over the head repeatedly before he left Walker's residence and went out to his car. There was no evidence that Laswell questioned what Lacy was doing or attempted to stop him. However, Laswell admitted to coming back inside the house and hearing Lacy ask about other guns or safes. Laswell was in the back bedroom where the safe was located with Walker and Lacy, with no explanation as to being there. Laswell admitted to hitting Walker over the head, and the evidence illustrates he wanted to harm Walker because he did it again after he stated that Walker was not fazed the first time. Laswell further admitted to looking in the safe and looking for other safes after he hit Walker. Additionally, he was aware of the contents of Walker's wallet, which was taken from the

---

1. Though charged with premeditated capital murder and capital-felony murder, the general verdict form used by the jury does not distinguish between the two. Our conclusion on the sufficiency point is based on the evidence submitted for capital-felony murder which we hold was clearly substantial. *See Taylor v. State,* 2010 Ark. 372, 372 S.W.3d 769 (citing *Williams v. State,* 347 Ark. 728, 67 S.W.3d 548 (2002)).

house. After the murder, Laswell participated in attempting to hide evidence at the boat ramp. In sum, the evidence supports a conclusion that Walker's death occurred during a robbery under circumstances manifesting extreme indifference to the value of human life. Therefore, the circuit court properly denied Laswell's directed-verdict motions.[2]

Laswell next argues that the circuit court erred when it failed to exclude testimony of Mark Queen as he discussed several incidents of other crimes, wrongs, and bad acts of |₁₂Laswell. Specifically, he appeals testimony regarding the following: Laswell referring to and expressing a desire to live the "thug life"; Laswell's interest in drug dealing and guns; Laswell's request to Queen for assistance in getting a gun; lack of sufficient funds to pay drug-court fees; and a lack of respect for the judge in drug court. Laswell contends that this testimony should have been excluded pursuant to Rules 402, 403, and 404(b) of the Arkansas Rules of Evidence. The State avers that the circuit court did not abuse its discretion as the evidence was not admitted to prove Laswell's character.

Rule 402 provides that

[a]ll relevant evidence is admissible, except as otherwise provided by statute or by these rules or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible.

Ark. R. Evid. 402 (2011).

■■■ Rule 404(b) provides that

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Ark. R. Evid. 404(b) (2011). Evidence is not admissible under Rule 404(b) simply to show a prior bad act. *See Vance v. State*, 2011 Ark. 243, 383 S.W.3d 325. Rather, the test for admissibility under Rule 404(b) is whether the evidence is independently relevant, which means it must have a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *See id.* Any circumstance that links a defendant to the crime or raises a possible motive for the crime is independently relevant and admissible under Rule 404(b). *See id.*

In reviewing the admission of evidence under Rule 404(b), this court has observed that circuit courts have broad discretion in deciding evidentiary issues, and their decisions are not reversed absent an abuse of discretion. *See Rounsaville v. State*, 2009 Ark. 479, 346 S.W.3d 289.

■■■ At trial, the State argued that part of Laswell's motive to harm Walker was the kind of life he desired to live, the "thug life." Indeed, much of Laswell's defense was geared toward disproving that theory and convincing the jury that Laswell did not have the intent or motive to steal from or to hurt Walker—that Lacy was the one with a motive. In Laswell's interview with Hines, which was played for the jury, he stated that he "did not want any part of that" when Walker was showing his gun to he and Lacy. Therefore, Queen's testimony was relevant to illustrate that Laswell had the intent, motive,

---

**2.** While Laswell also argues that the evidence was insufficient for the jury to find him guilty of the lesser-included charges of first-degree and second-degree murder, it is unnecessary to discuss that argument as we hold the evidence was sufficient for aggravated robbery and capital murder.

and state of mind to commit this crime, separate and apart from Lacy.

This court has repeatedly held that when the purpose of the evidence is to show a motive for killing, anything and everything that might have influenced the commission of the act may, as a rule, be shown. *See MacKool v. State*, 365 Ark. 416, 231 S.W.3d 676 (2006); *McGehee v. State*, 338 Ark. 152, 992 S.W.2d 110 (1999); *Sullivan v. State*, 171 Ark. 768, 286 S.W. 939 (1926). *See also Hodge v. State*, 332 Ark. 377, 965 S.W.2d 766 (1998) (where this court held that evidence of the appellant's party behavior, including the use of alcohol and marijuana, his engaging in sexual relations with a teenage girl, and his unauthorized use of his stepfather's credit card and business checks was admissible because the State contended that at least part of his motive in killing his victims was his desire to engage in a "hedonistic lifestyle"). We also note that the circuit court gave a 404(b) curative instruction by reading AMI Crim.2d 203–A during the charge of the court. Therefore, the circuit court did not abuse its discretion in finding Queen's testimony relevant in the instant case under Rule 402 and allowing it to be entered over Laswell's 404(b) objection.

Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ark. R. Evid. 403 (2011). This court has noted that evidence offered by the State in a criminal trial is likely to be prejudicial to the defendant to some degree, otherwise it would not be offered. *See Rounsaville, supra.* Nevertheless, the evidence should not be excluded under Rule 403 unless the defendant can show that the evidence lacks probative value in view of the risk of unfair prejudice. *See id.* This court reviews a circuit court's ruling under Rule 403 for an abuse of discretion. *See id.* While some of Queen's testimony may have been prejudicial, as most 404(b) evidence is, it was also independently relevant to Laswell's intent, motive, and state of mind in the instant case, and its probative value was not outweighed by the danger of unfair prejudice. Accordingly, we conclude the circuit court did not abuse its discretion in admitting Queen's testimony.

Laswell further argues that the circuit court abused its discretion in admitting certain items into evidence because the chain of custody was not sufficient for authentication under Rule 901 of the Arkansas Rules of Evidence. The State avers that the discrepancies about the location of certain evidence when it was collected and the fact that family members had access to the crime scene did not raise a reasonable probability that evidence was altered or planted in this case. Additionally, the State contends that Laswell failed to show prejudice from the items being admitted.

The purpose of establishing chain of custody is to prevent the introduction of evidence that has been tampered with or is not authentic. *See Crisco v. State*, 328 Ark. 388, 943 S.W.2d 582 (1997). *See also* Ark. R. Evid. 901 (2011). The circuit court must be satisfied within a reasonable probability that the evidence has not been tampered with, but it is not necessary for the State to eliminate every possibility of tampering. *See Crisco, supra.* Minor uncertainties in the proof of chain of custody are matters to be argued by counsel and weighed by the jury, but they do not render the evidence inadmissible as a matter of law. *See id.* We have stated that the proof of the chain of custody for interchangeable items like drugs or

blood needs to be more conclusive. *See id.* Absent evidence of tampering, the circuit court's ruling will not be disturbed unless it was a clear abuse of discretion. *See Mitchell v. State,* 321 Ark. 570, 906 S.W.2d 307 (1995); *Gomez v. State,* 305 Ark. 496, 809 S.W.2d 809 (1991).

■■■ At trial, Laswell objected to the admission of several pieces of evidence, including: photos of the recliner; the knife block; the front door; a wall blood swab; shoes; papers; a rag; a sock; two door swabs; a kitchen swab; a floorplan showing blood spots; a photo of a gas container; a photo of carpet cutting and gas container; the gas container; two cans of debris; a weight bar; a recliner; a bedroom photo; a five-pound weight and clamps; and photos of weights on carpet. The circuit court ruled that Laswell's chain-of-custody objections went to the weight of the evidence and not the admissibility.

There was evidence at trial that the crime scene, after the initial investigation, was left for several days. There was also evidence that Walker's son, his girlfriend, and other family members were in the house trying to salvage what they could and that they moved some of the evidence in that time. However, the record reveals that for each piece of evidence objected to, there was other testimony or evidence presented during trial that supported a finding that the items in question were what the State claimed they were. Much of that supporting evidence is from the statements made by Lacy and Laswell.

The instant case is not one in which there was a question regarding identity. Lacy and Laswell both admitted to being in Walker's home that night and to inflicting the wounds found on Walker. In other words, there would have been no motive for any party with access to the evidence to alter it. It is not a case similar to *Crisco, supra,* in which the defendant objected to the admission of an easily interchangeable substance, a drug, which had been described differently by the undercover officer who first handled it and the forensic chemist who tested it. For all these reasons, we hold that the circuit court did not abuse its discretion in admitting crime-scene evidence over Laswell's chain-of-custody objections.

Lastly, Laswell contends that the circuit court erred in granting the State's motion to exclude the expert testimony of Dr. Mark Cunningham from the guilt phase of trial because his testimony would have assisted the jury in determining the mental state of Laswell by helping them understand how his "planning, reason, consideration, and decision-making were affected by his young age, particular immaturity, history of substance abuse, the emergency situation, and the presence of the co-defendant." The State avers that the circuit court properly excluded the testimony because Laswell did not assert a mental-disease or mental-defect defense and that much of the testimony would have usurped the jury's role as fact-finder.

■■■ The decision to admit or exclude evidence is within the sound discretion of the circuit court, and we will not reverse that decision absent a manifest abuse of discretion. *See Buford v. State,* 368 Ark. 87, 243 S.W.3d 300 (2006). The general test for admissibility of expert testimony is whether the testimony will aid the trier of fact in understanding the evidence or in determining a fact in issue. *See* Ark. R. Evid. 702 (2011); *see also Buford, supra.* An important consideration in determining whether the testimony will aid the trier of fact is whether the situation is beyond the ability of the trier of fact to understand and draw its own conclusions. *See Buford, supra.* Where the introduction of expert testimony would

invade the function of the jury or where it does not help the jury, the testimony is not admissible. *See id.*

 After a hearing and considering the proffered testimony of Dr. Cunningham, the circuit court found that the testimony went to the ability of the defendant to form specific intent to murder, which was not admissible and would have invaded the function of the jury. Laswell did not assert an insanity defense and, therefore, the circuit court found that the testimony was irrelevant. Furthermore, the circuit court found that the testimony had the potential to be misleading or confusing to the jury.

We find no abuse of discretion in such a ruling. In *Stewart v. State*, 316 Ark. 153, 870 S.W.2d 752 (1994), we held that expert testimony on the ability of a defendant to form specific intent to murder is not admissible. This court drew a distinction between psychiatric testimony concerning whether a defendant has the ability to conform his conduct to the requirements of law at the time of the killing as part of an insanity defense and testimony on whether the defendant had or did not have the required specific intent to commit murder at a precise time:

A general inability to conform one's conduct to the requirements of the law due to mental defect or illness is the gauge for insanity. It is different from whether the defendant had the specific intent to kill another individual at a particular time. Whether Stewart was insane certainly is a matter for expert opinion. Whether he had the required intent to murder Ragland at that particular time was for the jury to decide.... While expert testimony on whether a defendant lacked the capacity to form intent is probative, we question whether opinion evidence on whether the defendant

actually formed the necessary intent at the time of the murder is.

*Stewart*, 316 Ark. at 159, 870 S.W.2d at 755 (citations omitted). We reiterated in *DeGracia v. State*, 321 Ark. 530, 906 S.W.2d 278 (1995), that:

The basis of our holding [in *Stewart v. State* ] was that Rule 704 requires that expert opinion of the sort that "embraces an ultimate issue" must be "otherwise admissible." To be otherwise admissible the evidence, according to Ark. R. Evid. 403, must be helpful to the jury and not tend to be confusing. We said in the *Stewart* case that the testimony in question was potentially misleading and confusing to the jury.

*DeGracia*, 321 Ark. at 532, 906 S.W.2d at 279.

In the instant case, Laswell did not assert the insanity defense. Therefore, any testimony from Dr. Cunningham regarding the inability to conform his conduct to the requirements of the law because of mental disease or defect was not relevant. *See Hinkston v. State*, 340 Ark. 530, 10 S.W.3d 906 (2000). While Laswell argues that Dr. Cunningham admitted that Laswell did not have a mental disease or defect and did not intend to specifically tell the jury that Laswell lacked the capacity to form premeditation, appreciate the criminality of his conduct, or conform his conduct to the requirements of the law, the heart of his proffered testimony did just that. In the proffer at the hearing, Dr. Cunningham testified that he could not tell the jury what actually happened, but that he could illuminate Laswell's reactions, mental capabilities, deficits, and reasons for those deficits; that mental disease or defect in psychology may be different than in the law; and that people can have all kinds of things that impact their planning, decision-making, and perceptions that are not statutory diseases or defects.

If this testimony was not simply an attempt to make a mental-disease-or-defect defense after the fact, it was, at the very least, confusing as to the point of its admission. For this reason, we hold that the circuit court did not abuse its discretion when it granted the State's motion in limine to exclude the expert testimony and affirm the circuit court's ruling on this point.

In addition to considering the arguments presented by Laswell, the record has been reviewed in this case for reversible error pursuant to Arkansas Supreme Court Rule 4–3(i) (2011), and none has been found. We, therefore, affirm the judgment and commitment order of the circuit court.

Affirmed.